**FEMALE UNION-BAND ASSOCIA-
TION et al., Plaintiffs,**

v.

**UNKNOWN HEIRS AT LAW, DEVISEES
AND ALIENEES OF Joseph MASON,
Deceased, et al., Defendants,**

and

**Neville Waters and Afro-American Bicen-
tennial Corporation, Intervenors.**

**Charles L. NORRIS et al., Plaintiffs,**

v.

**UNKNOWN HEIRS AT LAW et al.,
Defendants,**

and

**Neville Waters and Afro-American Bicen-
tennial Corporation, Intervenors.**

Civ. A. Nos. 2591–63, 1705–65.

United States District Court,
District of Columbia.

July 31, 1975.

George H. Windsor, Robert T. Smith, Washington, D. C., for plaintiffs.

Alan Raywid, Eric S. Sirulnik, Washington, D. C., for intervenors.

## MEMORANDUM–ORDER

GASCH, District Judge.

This matter is before the Court on trustees' petition to sell real estate under Order Nisi and intervenors' oppositions thereto, and intervenors' motions to vacate the August 10, 1964, Order permitting the disinterment of bodies buried in the west side of the Mt. Zion Cemetery and trustees' opposition thereto.

### I. *Background.*

Mt. Zion Cemetery occupies lots 802 and 803 in Squares 1288 and 1289 in the northeastern section of the Georgetown Historic District located at 27th and Q Streets, Northwest, Washington, D. C. The eastern portion of Mt. Zion Cemetery is known as the "Old Methodist Burial Grounds" and is owned by the Dumbarton United Methodist Church. The western portion, which is the subject of this litigation, is known as the Female Union Band Society Graveyard (hereinafter referred to as the Graveyard). It is owned by the heirs of Female Union Band Society members and the estate of Charles L. Norris. No fence separates the two properties, and over the years they have come to be known in the community simply as the Mt. Zion Cemetery.

The Female Union Band Society was founded by a group of free black women around 1842. The constitution and by-laws of this cooperative benevolent society pledged to each member assistance when sick, including the payment of two dollars a week, as well as a grave and twenty dollars for funeral expenses when deceased.

The Graveyard was purchased by Joseph Mason in trust for the Society for $250 on October 19, 1842, from Joseph E. Whitehead of New Orleans, Louisiana. The deed was recorded on August 8, 1843.[1] The land was used by the Society for burial grounds until 1950, when the last burial took place. The last regular meeting of the Female Union Band Society had been in 1948.[2]

In 1960 the Society resurrected itself to defend its title to the property against a claim to title by adverse possession filed by the Mt. Zion Methodist Church.[3] The Society was represented in this action by Charles L. Norris, Esquire. The Society prevailed and assigned a 25 percent interest in the

1. Liber No. WB 103, Folio 62, District of Columbia.

2. This geographical and historical information is contained in the Staff Report, Case No. 74–13, of the Joint Committee on Landmarks of the National Capital, February 28, 1975.

3. *Mount Zion Methodist Church v. Unknown Heirs of Mason,* Civ.A.No. 3294 (D.D.C. 1962), *aff'd,* 114 U.S.App.D.C. 243, 314 F.2d 248 (1963).

Graveyard to Mr. Norris as payment for his services.

The Society was unable to maintain the cemetery, however. No provision had been made for perpetual care. As a result the Graveyard fell into a state of disrepair. In 1953 the District of Columbia prohibited further interments because the cemetery was not in compliance with Health Department regulaions.

On October 22, 1963, the Female Union Band Society and Charles L. Norris petitioned this Court for permission to disinter the bodies in the Graveyard and bury them in another cemetery that provided perpetual care.[4] There being no opposition, the petition was granted by Judge Jones, sitting as Motions Judge, on August 10, 1964.

Thereafter another suit was filed to clear title to the property.[5] By Order dated April 20, 1967, Judge Walsh, sitting as Motions Judge, declared and adjudged fee simple title to the Graveyard vested in twenty-three named heirs of Society members and Charles L. Norris as tenants in common. On May 11, 1967, the Court appointed Charles L. Norris and George E. C. Hays trustees to sell the Graveyard for the benefit of the tenants in common.

The trustees attempted to obtain better zoning for the cemetery before selling it. The area was (and is) zoned for single family dwellings. They determined that the land would bring a better price if it were zoned for apartments or townhouses. But their application for a change in zoning was denied by the Zoning Commission on April 22, 1971.[6] The decision of the Zoning Commission was appealed to this Court, and the Court remanded the case back to the Zoning Commission for findings of fact on which the decision was based. The Zoning Commission still has the case open; no findings of fact have been made. Attorney's fees and costs of trial in connection with the Zoning Commission action amounted to approximately $20,000. These fees and costs were advanced by Charles L. Norris with the understanding that he would be reimbursed out of the proceeds of the sale of the property.

After the original trustees died, Robert T. Smith and George H. Windsor were appointed trustees to sell the land. Robert T. Smith is also a co-executor of the estate of Charles L. Norris. The new trustees decided to sell the land under its present zoning status. On November 8, 1973, they executed a contract to sell the land to David W. Evans at a price of $144,000 plus costs of disinterment of the bodies in the Graveyard and reburial elsewhere.[7] On February 7, 1974, the trustees petitioned this Court for permission to sell the land under the Order Nisi. This petition was assigned to the Court sitting as Motions Judge and is now before the Court.

On April 23, 1974, the Court granted Neville Waters leave to intervene in opposition to execution of the Order of August 10, 1964.[8] Neville Waters is the son of Gertrude Turner Waters, one of the Society members who petitioned the Court for permission to disinter in 1963.

On June 26, 1974, the Court granted the Afro-American Bicentennial Corporation (hereinafter referred to as ABC) leave to intervene in opposition to the execution of the Order of August 10, 1964.[9] ABC is a private non-profit research organization and consulting firm.

---

4. *Female Union Band Association v. Unknown Heirs of Mason*, Civ.A.No. 2591–63.

5. *Charles L. Norris v. Unknown Heirs of Mason*, Civ.A.No. 1705–65.

6. Zoning Case No. 69–31.

7. The cost of disinterment and reinterment is estimated to be $100,000.

8. Neville Waters first moved to intervene on February 14, 1974. The motion was granted February 22, 1974. The Order was vacated February 28. A second motion was made March 14, 1974. It is this motion which was granted April 23.

9. ABC first moved to intervene on March 18, 1974. The motion was denied April 23. Thereafter ABC acquired the interests of two of the owners of the Graveyard, Collins C. George of Detroit, Michigan, and Catherine G. Smith of Philadelphia, Pennsylvania.

## II. *Efforts at Restoration.*

Both Neville Waters and ABC moved pursuant to Rule 60(b)(5) or (6) of the Federal Rules of Civil Procedure [10] to vacate the August 10, 1964, Order permitting disinterment and opposing the May 11, 1967, Order permitting sale of the land on grounds of changed circumstances, public policy, violation of present D.C. law,[11] and laches.[12]

Intervenors pointed out in their motion [13] that in 1963 the cemetery was unkept; [14] there was no provision for perpetual care; there was no willingness to undertake maintenance; and it was in the best interests of the community to terminate cemetery use of the land.

In 1974 the cemetery was still unkept, but a recent inspection by the D.C. Health Department [15] indicated that all

These assignments are contingent upon the land being preserved as a cemetery or a memorial park; otherwise the interests revert to the heirs. ABC again moved to intervene on June 12, 1974. It is this motion which was granted June 26.

10. Rule 60(b) states in part as follows: On motion and upon such terms as are just, the court may relieve a party or his legal representative from a final judgment, order, or proceeding for the following reasons:
 (5) . . . it is no longer equitable that the judgment should have prospective application; or
 (6) any other reason justifying relief from the operation of the judgment.
The motion shall be made within a reasonable time . . . .

11. The 1963 Complaint based its jurisdiction on 27 D.C.Code § 128, 1961 edition, Disinterment by order of court, which stated as follows:
 Nothing in sections 27–101 to 27–114, 27–115 to 27–117, 27–119a to 27–128 shall be construed to interfere with or prevent the disinterment of any body when such disinterment is ordered by one of the judges of the United States District Court for the District of Columbia . . . .
The 1973 edition of the D.C.Code limits disinterment by order of court to disinterments in accordance with 11 D.C.Code § 2311, which authorizes disinterments upon request of a law enforcement official for the purpose of an autopsy in a criminal matter. Furthermore, the current § 128 does not specify United States District Court for the District of Columbia.
Intervenors argue that this is another example of changed conditions in that "the legislature has acted to further express its policy against the wholesale disinterment of cemeteries."
More likely this is a result of the 1967 Reorganization Plan No. 3 which abolished the existing three commissioner form of government for the District of Columbia and established in its place a single commissioner and a nine-man council form of government. Section 401 of this Reorganization Plan No. 3 transferred authority under § 128 of the

1961 edition of the D.C.Code to the Commissioner.

12. It was six years from the 1967 Order appointing trustees to sell the land to the execution of a contract of sale by the trustees in 1973. But the trustees were active in the interim attempting to get a change in zoning. The defense of laches under the circumstances is hardly appropriate.

13. Intervenor's Motion to Vacate Judgment Allowing Disinterment of Cemetery, Civ.A. No. 2591–63.

14. The Complaint for Order of Disinterment, filed October 22, 1963, stated as the reason for seeking disinterment the facts that "there are no exact burial records or maps reflecting the location of the bodies in said cemetery; many of the tombstones have been moved or fallen and the cemetery has become in such condition with the overgrowth of weeds, trees and foliage, unmarked mounds and sunken spots and possibly unauthorized burials that graves cannot be located with any degree of certainty nor are the heirs at law . . . known . . . ."
"The said cemetery is not in compliance with certain orders and regulations of the District of Columbia Health Department relating to the conduct of cemeteries in D.C. and consequently no burials are permitted therein, nor have there been any burials therein . . . for more than twenty years. No provision was ever made by said association (Female Union Band Society) for perpetual care of said cemetery and as a consequence, the said cemetery and premises is in such condition as is related (above), that it is economically not feasible to conform to present day regulations of said Health Department. It would be to the best interests of the community, as well as to persons who may be interested in the remains there interred if plaintiff association be authorized and permitted to disinter and reinter said remains in a cemetery or cemeteries kept and maintained under present day perpetual care requirements."

15. The inspection was made February 7, 1974.

that needed to be done to conform the cemetery to Health Department regulations was to cut back brush and weeds, set straight toppled tombstones, and fill in depressions which had appeared over certain grave sites. Furthermore, the interest of ABC and other groups in preserving this historically unique cemetery contrasted with the Society's inability to maintain the cemetery in the 1950's and 1960's. Finally, the intervenors suggested, there was a possibility that Mt. Zion Cemetery might be declared a national monument and thereby come under the perpetual care of the United States Department of the Interior.

In June, 1974 the Court met with all parties in chambers. ABC stated that it was willing to purchase the Graveyard for one dollar in order to preserve it as a national landmark. The trustees replied that they had executed a contract to sell the land; if ABC wanted to preserve the land as a cemetery, it should offer to purchase the Graveyard for the sale price of $144,000. ABC admitted that it did not have funds to purchase the land but suggested that volunteer help could be used to restore and maintain the Graveyard until it could be taken by the Interior Department. The trustees rejected the suggestion that volunteer help could restore the cemetery, and they questioned whether money could be found for perpetual care, noting that prior efforts to have the cemetery taken by the National Park and Planning Commission had failed. They contended that there was no change in circumstances because there was still a lack of funds to buy, restore, and maintain the Graveyard.

In July ABC wrote the trustees and offered to clean up the Graveyard so that it would be in conformity with Health Department regulations.[16] The trustees' response did not discuss the proposed offer of assistance in clean-up.[17]

---

16. Letter of July 2, 1974, from Alan Raywid, counsel for ABC, to trustees Robert T. Smith and George H. Windsor:

Gentlemen:

At the hearing in this matter it was established that there are various health code violations concerning the Mt. Zion Cemetery, which is under your trusteeship. These violations included sunken graves, trash, and overgrowth. I believe it was also asserted that the trustees have no funds or means to effect correction of these violations. On behalf of my client, the Afro-American Bicentennial Corporation, we would like your permission to undertake corrective action to remedy these violations through voluntary help and labor. We would be happy to meet with you concerning any necessary details.

This letter is not construed as a proposed settlement of the pending action, and we reserve the right to disclose its contents and your response to the Court or to any other interested party. Your attention in this matter is appreciated.

This letter is Attachment A to ABC's Motion for Order to Show Cause.

17. Letter of July 8, 1974, from Robert T. Smith to Alan Raywid:

Dear Mr. Raywid:

In accordance with a Court Order, the Trustees for the Female Union Band Society have contracted in writing to sell the west portion of the Mt. Zion Cemetery property for $144,000, the buyers to be responsible for the payment of the cost of disinterment and reburial of the bodies located therein in an established cemetery offering perpetual grave care.

As I have pointed out to you previously, if the Afro-American Bicentennial Group or the Federal or District Government desire to acquire the property for a Government Park or historical site, they have an equal opportunity to acquire the property at the Order Nisi sale. Extensive negotiations have been had with the National Capital Park Service dating back to 1969 for an exchange of property. These negotiations proved futile.

At a zoning Hearing involving this property in 1971, Zoning Case No. 69–31, expert testimony revealed that to restore the cemetery to minimum level of acceptability would cost $242,460.00 and that the total annual cost to maintain it at that level would be $28,856.00. We can assume that both figures would now be considerably higher taking into consideration the inflationary trend during the past several years.

At the Court hearing in this matter it was obvious that your client does not have funds allocated for the restoration, main-

On November 13, ABC moved for an order to show cause why the trustees of the Graveyard should not be ordered and directed to permit a routine maintenance and clean-up of the cemetery as proposed and offered by ABC, or, in the alternative, to clean it up themselves. The trustees responded [18] that the Court-ordered disinterment and sale would eliminate any violations of Health Department regulations. They stated that they did not have the authority or the funds to maintain the property; their only job was to sell the land. They objected to having volunteers on the property because this would expose the trustees and owners to liability claims by any volunteers who might be injured while working in the Graveyard.

A lengthy hearing was held in open court on December 9, 1974, on the cost and feasibility of restoration and maintenance of the cemetery, matters which went to the issue of changed circumstances. The trustees presented two expert witnesses [19] who testified that it would cost $377,931 to restore Mt. Zion Cemetery (both portions) and $42,111 annually for maintenance. Then the intervenors presented their witnesses.

Captain John Sullivan, president of the American Federation of Police, described how his group, with the help of the Police Boys' Club and other volunteer associations, had restored old Congressional Cemetery and the Dumbarton Church portion of Mt. Zion Cemetery.[20] He indicated the Federation's willingness to clean up the Female Union Band Society portion of Mt. Zion Cemetery and assured the Court that all volunteers would provide releases from liability.

Delegate Walter Fauntroy then testified that he would sponsor legislation to have Mt. Zion Cemetery designated a national monument.[21]

tenance or purchase of the property. The Trustees, therefore, are proceeding in the only proper and Court authorized manner by offering the property for sale by Order Nisi, which sale includes provision for reburial of the bodies in a perpetual care cemetery at a cost of approximately $100,000.00.

18. Trustees' Answer to Intervenors' Motion for Order to Show Cause, Civ.A.No. 1705–65.

19. Stanton L. Wormley is chairman, Board of Governors, Rock Creek Cemetery; member, Board of Directors and Executive Committee, Harmony Memorial Park.

Alvin E. Melton is past president of the American Cemetery Association and the Maryland-District of Columbia Cemetery Association; former superintendent of Rock Creek Cemetery and now executive vice president of Fort Lincoln Cemetery and president of Rock Creek Cemetery and Mount Comfort Cemetery.

20. The Old Methodist Burial Grounds portion of Mt. Zion Cemetery, owned by Dumbarton United Methodist Church, has had a separate but similar history to the Female Union Band Society Graveyard. The Burial Grounds, too, fell into disrepair. On September 19, 1963, in Civ.A.No. 815–63, *The Dumbarton Street Methodist Episcopal Church v. Unknown Heirs*, Judge Tamm, then of this Court, granted the petition of the Dumbarton Church to permit the disinterment of bodies in the Burial Grounds and bury them in another cemetery that provided perpetual care. Thereafter Dumbarton Church joined with Charles L. Norris in attempting to have the zoning of Mt. Zion Cemetery changed.

On April 24, 1974, this Court granted John A. Butler's motion to intervene and his motion to vacate the September 19, 1963, Order to disinter bodies. John A. Butler is a direct descendant and heir at law to several persons buried in the east side of Mt. Zion Cemetery. Dumbarton Church stipulated on April 18, 1974, that it did not oppose the intervenor's motion to vacate the Order to disinter bodies.

Thus title to the east side of Mt. Zion Cemetery remained vested in the Dumbarton United Methodist Church as a result of this Court's Order of April 24, 1974. Thereafter the church, with the assistance of ABC and the American Federation of Police, undertook the restoration of the cemetery. That portion of Mt. Zion Cemetery has been brought into conformity with Health Department regulations.

21. The statutes which govern the program of the United States Government in the area of preservation of historic places are the Historic Sites Act of 1935 (16 U.S.C. §§ 461 *et seq.* [1935]) and the Historic Preservation Act of 1966 (16 U.S.C. §§ 470 *et seq.*), which extended the scope of the earlier statute by including sites of state and local, as well as national, significance.

Charles Cassels, an architect and professor at Federal City College, testified that the D. C. Council of Black Architects endorsed ABC's plan to restore the cemetery and was prepared to provide voluntary services from its member firms.

Lester Collins, retired professor and former chairman of the department of landscape architecture at Harvard University, presented in testimony an imaginative proposal for a restored Mt. Zion Cemetery and the creation of a Memorial Park. He testified that such restoration could be accomplished at nominal cost with volunteer help, and he offered to provide landscaping plans and supervision.

Knox Tull, professor of architecture and engineering at Washington Technical Institute, testified that he was prepared to locate, identify and plot all grave markers for the restoration at no cost.

Finally, Vincent deForest, chairman of ABC, testified that other groups have volunteered their assistance in restoring the cemetery. He announced that ABC had petitioned the Joint Committee on Landmarks of the National Capital [22] to designate Mt. Zion Cemetery as an Historic Landmark. He admitted again that ABC did not have the funds to purchase the Graveyard.

Subsequently the Court visited Mt. Zion Cemetery for the second time and noted the volunteer work performed in the Dumbarton Church portion of the cemetery and the unkept condition of the Society portion.

On December 13, 1974, the Court issued an Order authorizing ABC and those acting in concert with it to contribute voluntarily their labor and services to remove dead trees, small trees, saplings, trash, and undergrowth from the Female Union Band Society portion of Mt. Zion Cemetery. The Court conditioned the acceptance of such volunteer services on the furnishing of adequate insurance to cover liability or waivers of liability by the volunteers.

On March 27, 1975, ABC moved the Court to amend its December 13 Order to permit additional interim care of the Graveyard. This motion was vigorously opposed by trustee Robert T. Smith at a hearing on April 7. On April 8, 1975, the Court issued an Order authorizing ABC and those acting in concert with it to transcribe the present location of all graves, markers, and memorials; catalog and mark all memorial and burial markers; temporarily remove all markers and monuments for the purpose of grading and filling sunken grave sites; seed and plant appropriate ground cover; and construct a temporary fence or other barrier to restrain persons from dumping trash or refuse on the property. Again ABC was directed to provide liability insurance or waivers of liability.

On July 24, 1975, the Court received a letter from the D. C. Health Department dated July 17, 1975, stating that the Mt. Zion Cemetery, including the west section owned by the Female Union Band Association, is in conformity with Health Department regulations with the exception of leveling the earth over certain sunken graves and providing ground cover. The letter noted that ABC is completing the transcription of grave markers and then intends to fill sunken graves and seed the ground.

The Court has made another visit to the Cemetery and observed that work is progressing.

---

22. The Joint Committee on Landmarks of the National Capital is jointly sponsored by the Mayor of the District of Columbia, the Commission of Fine Arts, and the National Capital Planning Commission. The Statement of Functions and Membership of the Committee requires the Committee to compile and maintain a current inventory of significant landmarks in the District of Columbia and on Federal property in the remainder of the National Capital Region, to serve as the District of Columbia's professional review committee to review all nominations to the National Register of Historic Places, and to adopt and publish appropriate procedures in connection with its functions.

III. *Efforts at Preservation.*

At the same time that ABC by leave of Court was making efforts to restore Mt. Zion Cemetery to bring it into conformity with Health Department regulations, it was also trying to find a way to provide perpetual care for the cemetery. ABC petitioned the Joint Committee on Landmarks of the National Capital[23] to designate Mt. Zion Cemetery an Historic Landmark. A hearing was held on March 7, 1975, at which time the Committee's staff recommended that the petition be granted. Robert T. Smith, one of the trustees of the Graveyard, and Vincent deForest, chairman of ABC, were among those who testified concerning the petition.

On April 29, 1975, the Joint Committee announced its decision granting ABC's petition. The Committee designated Mt. Zion Cemetery an Historic Landmark and recommended it for nomination to the National Register of Historic Places. It explained its reasons as follows:

> The Mount Zion Cemetery (Methodist Episcopal Burying Grounds; Female Union Band Society Graveyard) qualifies as a Category II Historic Landmark of importance [24] which contributes significantly to the cultural heritage or visual beauty and interest of the District of Columbia and its environs and which should be preserved or restored for the following reasons:
>
> (1) Its history and that of the generations of Blacks both free and slave interred therein uniquely convey the quality and thrust of Black life and evolving free Black culture in the District of Columbia from the earliest days of the city to the present.
>
> (2) It is one of the few remaining physical reminders of the significant contributions of Black people to the development of Georgetown, which during the late nineteenth century was between 35 and 45 percent Black in population.[25]

The Court understands that Delegate Fauntroy has prepared legislation to establish Mt. Zion Cemetery as a National Historic Site in the District of Columbia. If enacted by Congress, the Cemetery would become a public national memorial park, administered and developed and preserved by the National Park Service under the direction of the Secretary of the Interior.

IV. *The Court's Decision.*

██ It is obvious from what has been stated above that the conditions in 1964 which led Judge Jones to authorize the disinterment of bodies from the Graveyard have changed materially. The cemetery is now in substantial conformity with Health Department regulations. Maintenance is being provided on an interim basis. There is a possibility that the cemetery may be acquired by the United States Department of the Interior, thereby providing perpetual care. Such changed conditions raise the question of whether it is equitable that the judgment made in 1964 be executed in 1975.[26] The Court thinks it is not. For

---

23. See footnote 22 *supra.*

24. Category II Historic Landmarks and Historic Districts are those of "importance" as compared with those of "great importance" (Category I) and those of "value" (Category III). "Procedures for the Designation of Historic Landmarks and Historic Districts," Joint Committee on Landmarks of the National Capital, November 26, 1974, at 2–1.

25. Whereas ABC's petition asserted that Mt. Zion Cemetery's significance lay in its identity as a slave cemetery, the Joint Committee finds it significant in its relation to evolving free Black culture in the District of Columbia. "Staff research has found that the Old Methodist Burying Ground section of the cemetery was founded as the biracial burying ground of a biracial congregation. There is no evidence that the cemetery was ever used exclusively for the burial of slaves, though, because it was the custom to bury slaves in church cemeteries, many slaves associated with the Dumbarton Street Methodist Episcopal Church must have been buried there." Staff Report on Mt. Zion Cemetery, Joint Committee on Landmarks of the National Capital, February 28, 1975, at 2.

26. Rule 60(b)(6), F.R.Civ.P.

the following reasons the Order to disinter the bodies will be vacated.

 We begin with the fact that disinterment of a single body is not favored in the law.[27] Public policy frowns on the disinterment of a body and its removal to another burial place, and it is the policy of the law, with certain exceptions,[28] that the sanctity of the grave should be maintained, and that a body once suitably buried should remain undisturbed.[29]

Here we are not dealing with a single dead body but with innumerable bodies of persons known and unknown.[30] Disinterment would not be one by one, but *en masse*. It would be executed not by shovel, but by a bulldozer-like machine called a "back-hoe." No matter how reverently the back-hoe might be maneuvered, no matter how respectfully the bones might be placed into a pile,[31] this kind of operation cannot but offend the sensitivities of civilized people.

A mass disinterment similar to the one at issue in this case was carried out in 1959 when Columbian Harmony Cemetery was moved from northeast Washington to Landover, Maryland. In recent months Metro workers digging on the former site of Harmony Cemetery have uncovered the remains of bodies unreached, overlooked, or ignored during the mass disinterment of that cemetery.[32] Yet the bodies from that cemetery were properly disinterred.[33] There is no reason to believe that the disinterment would be different at the Female Union Band Society Graveyard.

Equally important is the fact that not only would such a degradation be perpetrated against the dead, but in this in-

27. *Labiche v. Certain Insurance Companies or Underwriters at Lloyd's, London, England*, 196 F.Supp. 102 (E.D.La.1961) (J. Skelly Wright, J.). "Respect for the body of the dead is part of our culture which militates against granting motions [to exhume]." At 104–105.

28. *Ibid.*

29. *Travelers Insurance Co. v. Welch*, 82 F.2d 799 (5th Cir. 1936) and State cases cited in 25A C.J.S. Dead Bodies § 4(1), n. 30 (1966).

30. A plat exists showing the location of 159 known deceased and 275 unknown deceased buried in both sections of Mt. Zion Cemetery. It is believed, however, that there are perhaps many others buried in the cemetery whose places of burial were never noted.

31. No attempt is made to keep bodies separate and apart from each other. Disinterred remains are piled together, and then caskets are filled.

32. PRE–CIVIL WAR COFFINS TURNED UP BY METRO is the title of an article appearing in the Washington Star-News of July 17, 1974. The article reads in part as follows:
"Metro bulldozers have unearthed and shattered at least five coffins at the former site of a pre-Civil War black cemetery at 8th Street and Rhode Island Avenue, N.E.
"Discovery of the coffins came as a surprise because all the graves in the old Columbia Harmony Cemetery—an estimated 33,000—were supposedly relocated in 1960 to the National Harmony Memorial Park in Prince Georges County.
"It could not be determined immediately if the coffins still contained remains, although a bone fragment and fabric were discovered at two sites.
\*　　\*　　\*　　\*　　\*
"Rev. Jerry Moore, a Metro board member and D. C. councilman said he had received complaints that the workers just throwing away any bones they discovered.
"Moore said any bones or bodies should be preserved and reinterred at Metro's expense. He said he will seek a District bill preserving old city cemeteries 'so there is no more desecration of this sort.'"
An article in the Star-News on the following day entitled FEW BONES FOUND noted that "Richard Bell, manager of the National Harmony Memorial Park Cemetery in Prince Georges County, found only one bone fragment in an inspection yesterday of the Rhode Island Avenue Metro work site where pre-Civil War coffins have been discovered. Bell said he didn't think any bodies were left in the area of the 116-year-old cemetery that was relocated in 1960. But Bell left several boxes for Metro workers to collect any more bone fragments they uncover in the area and said he would rebury them."

33. "Proper disinterment is done under the supervision of the D. C. Health Department and in accordance with Health Department regulations concerning Disposition of Dead Bodies, § 8–2:226, Blanket Disinterment Permits.

stance the violation of their graves involves the destruction of a monument to evolving free Black culture in the District of Columbia. At the time the Order to disinter bodies was entered there was insufficient interest in preserving a monument to Black people, and respect for these Black departed dictated removal of their remains to an attended cemetery. Such is not the case in 1975.

Today both Black and white Americans are concerned to recognize Black contributions to our nation's heritage and to commemorate it by appropriate monuments. That Mt. Zion Cemetery is looked upon as such a monument is demonstrated by the large numbers of Blacks and whites who have worked side by side to restore it. It would be an affront to the entire community and a betrayal of America's quest for human dignity for all people to permit the disinterment of this cemetery when there is a possibility of its restoration and maintenance in perpetuity as a monument to Black traditions in our nation's capital.

## V. *Some Equitable Adjustments.*

However, if the Order to disinter is to be vacated, the Court, sitting as Chancellor, must seek to deal equitably with the other claims against the land.

The first of these is the claim of the Norris estate. Mr. Norris expended approximately $20,000 of his own money attempting to obtain a change of zoning of the Mt. Zion property before selling it.[34] In so doing he was representing his own interest as well as that of the decedents of the Female Union Band Society. It was understood that he would be reimbursed from the proceeds of the sale of the property. If no sale takes place, that money cannot be repaid.

In this case, however, the Court does not believe that equity compels reimbursement. Mr. Norris and the other owners could have sold the land "as is," that is, with the single family zoning that was and is in effect. Instead he and they[35] tried to obtain apartment or townhouse zoning that would bring a more favorable price for the land. This was a speculative venture. If it had succeeded, the land would have been sold long ago for a higher price, all to the benefit of the owners. Since it failed, those who speculated must sustain the loss.

There is also the claim of the known owners of the land who expected to derive some money from the sale of the cemetery. This expectancy ranges from approximately $30,500 for the Norris estate to approximately $762.50 for one of the other owners.[36] The precise interest

---

34. See *supra* at 542.

35. Presumably Mr. Norris was the initiator of this attempt at rezoning. He devoted his professional life to the real estate business in Washington. He had his own real estate business (Woodward & Norris); he was president of the Home Building Association, the Savings & Loan Institution, the old Washington Real Estate Board (now called the Washington Board of Realtors), and the D. C. Society of Residential Appraisers.

Furthermore the minutes of the Female Union Band Association Meeting of November 29, 1960, exhibit to plaintiff's motion for summary judgment in Civ.A. No. 3294–60, *Mt. Zion Methodist Church v. Unknown Heirs of Mason*, state as follows:

"A meeting of The Ladies Union Band was called by our counsel Mr. Charles Norris Sr. to consider a suit filed by the Mount Zion Methodist Church. Mr. Norris read to us a

copy of the suit he had observed had observed (sic) in the Law Recorder and a copy of the same he had secured from the lawyer for the Mt. Zion Methodist Church. According to the suit all the legal heirs had been declared dead; it also stated that The Ladies Union Band had not functioned for the last 20 years or more . . . .

"We employed Mr. Norris to proceed as counsel for The Ladies Union Band to answer the suit as filed by the Mount Zion Methodist Church."

36. The interest owned by each of the 24 owners was set out in Judge Walsh's Order of April 20, 1967. The amount of money for each owner is calculated by taking the sale price of the Graveyard (approximately $144,000), and deducting the expenses incurred by the Norris estate (approximately $20,000) and the commission for the trustees, expenses which would have been paid

of most of the descendants as well as their identity is to the Court unknown but this does not prevent the Court from recognizing that usually the descendant of one buried in an ancient graveyard prefers to have the bones of his ancestor rest in peace.

■ The law is clear that financial benefit is not a sufficient reason for disinterment.[37] Thus the law itself disposes of this claim. But the Court believes that this disappointment of the owners' financial hope [38] will be compensated at least in part by the satisfaction of knowing that their departed can rest in peace, and that those who chose to be buried with their loved ones will not be separated from them.

■ A more difficult problem is presented by the Norris estate's interest. This 25 percent interest in the land was assigned to Mr. Norris in payment for his legal services in protecting the cemetery from the claim by adverse possession of the Mt. Zion Methodist Church,[39] and in settling title.[40] If the land is not sold, but is taken by the United States Government as a national monument,

these services will be uncompensated. The Court has examined the record in both cases and has determined that the Norris estate should be compensated for professional services rendered in an amount to be determined subsequently.

A third claim is that of David W. Evans, who has contracted with the trustees to purchase the Graveyard. However, the contract was made "subject to court approval under an Order Nisi," so that Mr. Evans has been on notice from the beginning that the sale was conditional.[41]

■ Finally there is the claim of the trustees, Robert T. Smith and George H. Windsor, both members of the Bar of this Court. The trustees were appointed to sell the land. Pursuant to that appointment they sought and found a purchaser. They negotiated a sales contract. They incurred expenses in having the land appraised and in defending the owners' expectancy against the intervenors' motions. If the land had been sold, they would have received a percentage of the gross sale price as their commission in the amount of $1,710.00.[42]

---

prior to distribution of the money from the sale, if the sale had gone forward. That would leave approximately $122,000 to be distributed among the owners in proportion to their percentage of interest owned.

Mr. Norris owned a 25% interest in the land. See *supra* at n. 3.

37. 25A C.J.S. Dead Bodies § 4(1) at 498, citing *Application of Hilliard*, Sup., 91 N.Y. S.2d 547 (1944) and *In re Adams*, Sup., 172 N.Y.S. 612 (1918).

38. It should be noted that we are dealing not with a right but with a hope. Disinterment of a body is not a right, but is subject to the control and discretion of a Court of equity. 25A C.J.S. Dead Bodies § 4(1) at 496 citing *Friedman v. Agudath Achim North Shore Congregation*, 351 Ill.App. 413, 115 N.E.2d 553 (1953). Furthermore, the Order Nisi appointing trustees to sell the land required Court approval for the sale.

39. *Mount Zion Methodist Church v. Unknown Heirs of Mason*, Civ.A.No. 3294–60 (D.D.C. 1962), aff'd 114 U.S.App.D.C. 243, 314 F.2d 248 (1963).

40. *Female Union Band Association v. Unknown Heirs of Mason*, Civ.A.No. 2591–63.

41. Sales Contract by and between Female Union Band Society, Robert T. Smith and George H. Windsor, Trustees for Female Union Band Society, and Lenora N. Hunter and Robert T. Smith, Co-Executors of the Estate of Charles L. Norris, Sellers, and David W. Evans, Purchaser, section 11, Conditions.

42. Former Rule 28 of the Civil Rules of this Court, in effect at the time this suit was filed, and adopted as Rule 308(e) of the Rules of Civil Procedure of the Superior Court of the District of Columbia in 1970 establishes the compensation of the trustee or trustees making a sale under a court order. Rule 308(e) states as follows:

"The compensation of the trustee or officer making a sale hereunder shall be five (5) per cent on the first three thousand ($3,000.00) dollars, plus two and one-half (2½) percent on the next ten thousand ($10,000.00) dollars, plus one (1) percent on any amount in excess of thirteen thousand ($13,000.00) dollars of the value of the equity in the property being sold. In the event that the property is unencumbered by indebtedness, the compensation of the trustee or officer making the sale shall be

The fact that the land is not going to be sold should not preclude their being paid for having performed the tasks assigned them by the Court and thrust upon them by circumstance. They will also be allowed a reasonable amount to cover expenses of land appraisal and restoration and maintenance appraisal.

Fortuitously the Foundation for the Preservation of Historic Georgetown has raised and placed a sum of money in the Registry of the Court to be utilized for the restoration and interim maintenance of the Graveyard and such other purposes as the Court finds consistent therewith. Of this sum the Court plans to make payment of $1,710.00 to the trustees for their services, as well as an appropriate amount for their expenses, and a reasonable sum to the estate of Charles L. Norris as compensation for his services in representing the Female Union Band Society in the adverse possession suit filed by the Mt. Zion Methodist Church and in clearing title to the land in the instant suit. The remainder of the money donated by the Foundation for the Preservation of Historic Georgetown shall be made available to the newly-appointed trustees for restoration and interim maintenance of the Graveyard.

Upon the payment to trustees Robert T. Smith and George H. Windsor the Court is relieving them of their duties. Since the land is not going to be sold, their work is completed.

Other trustees must be appointed, however, to oversee the restoration of the cemetery and to work for its perpetual care. For this task the Court is appointing Alan Raywid, Esquire, and Eric Sirulnik, Esquire. They will serve without remuneration and will file semi-annual reports with the Court on the progress of restoration and providing perpetual care.

No one could have foreseen in 1963 when this action began how different the situation would be in 1975. What was then a deteriorated cemetery is now being restored; a forgotten graveyard has become an Historic Landmark to evolving free Black culture in the District of Columbia. As a result, it is now possible to fulfill for these dead a hope expressed by a well known poet:[43]

When all is done and in the oozing clay,

Ye lay this cast-off hull of mine away,
Pray not for me, for, after long despair,

The quiet of the grave will be a prayer.

Therefore, it is by the Court this 31st day of July, 1975,

Ordered that the August 10, 1964, Order of Judge Jones of this Court in Civ. A.No. 2591–63 permitting disinterment of bodies buried in the west end of the Mt. Zion Cemetery (the Female Union Band Society Graveyard) be, and it is hereby, vacated.

Further Orders on other matters in this Memorandum will be forthcoming.

REQUIESCANT IN PACE.

---

computed and paid at the same rate upon the entire sales price. The compensation may be increased or reduced by the Court for special cause shown in writing."
On this basis, the trustees' compensation for a sale in the amount of $144,000 would be calculated as follows: 5% on the first $3,000 = $150.00; 2½% on the next $10,000 = $250.00; and 1% on the remaining $131,000 = $1,310.00, for a total of $1,710.00.

43. Paul Lawrence Dunbar: "When All is Done."